You may be seated. This is our first case of mourning the State of Ely versus OSF Health Appellant, you may introduce yourself please. I'm going to have to speak up. I'm old. I can't hear. Good. In the Appalachians? Good afternoon, your honor. I'm Scott Howey. I'm a co-dependent at Ely's. I'm with Dr. Thomas Vlasi and the Bureau of Surgery. Good afternoon, Joseph Kulik on behalf of the Dependents, Ely's, OSF Healthcare System, and Dr. Shane O'Para. And you've divided your time. Yes, your honor. You may proceed. May it please the court. And the other thing, that doesn't amplify, it just records. I will do my best to amplify, your honor. Justices, counsel, good afternoon. Justice demands that this court vacate the judgment entered in favor of the defendants and remand this case for a new trial with instructions. Plaintiff's appellant has set forth numerous issues in the briefs. Although, given the time constraints, I'd like to focus on just a few. Those being the direct verdict entered in favor of Samuel O'Para on the issue of duty, the jury instruction regarding the injury to the external iliac artery, and the disparity in the treatment of plaintiff's experts and the defense expert witnesses during the course of the trial and the preliminary proceedings. Turning to my first point, the trial court improperly granted the motion for a directed verdict in favor of Dr. O'Para. This verdict, directed verdict, was entered on the issue of duty. To establish duty in a medical malpractice case, all a plaintiff has to do is show the standard of care required by Dr. O'Para, and what that standard is to which Dr. O'Para will be judged. Now, directed verdict should only be entered when all of the evidence overwhelmingly favors the defense in this case. And that simply cannot be said for numerous reasons. One, all the experts, Dr. Fallis, which is plaintiff's general surgery expert, Dr. Para, which is a general surgery witness, and Dr. Rossi, the general surgery attendant, all of them agreed during plaintiff's case-in-chief that the standard of care requires protecting the iliac, which includes the external iliac artery, when operating in the retroperitoneum, which is where Dr. Para and Dr. Rossi were operating. That's just the first point. Then, Dr. Fallis issued numerous other standard of care opinions. For example, the standard of care requires protecting the iliacs. That's on Report Proceedings 485. Standard of care requires to convert to open if unable to delineate anatomy, 483 of Report Proceedings. Standard of care, when unable to delineate anatomy in the retroperitoneum, standard of care requires to not to proceed dissecting, meaning stop what you're doing, convert to open. And he says that later on. The standard of care required to convert to open when in tiger cut. That's where you're unable to visualize anatomy, according to Dr. Rossi. Now, this is important because just those opinions alone, notwithstanding the agreements of all three of those witnesses, would preclude a directed verdict because he's already set forth what standards Dr. Para was to be judged by. This is not on breach. This is not on causation. It's simply on duty. When the defense filed a motion for directed verdict, they even conceded that Plaintiff presented evidence through expert testimony of Dr. Fallis as to those breaches, those breaches being continued dissecting when unable to identify anatomy being transected, continued dissecting after being told by an attending to discontinue, and injured the external iliac artery. That concession is on common law record 3428 to 3429. That's in their own motion. Then, during the hearing on the directed verdict, they only discussed, the defense only argued Dr. Fallis didn't set forth the standard of care. Dr. Fallis alone. Now, directed verdicts require all the evidence. You don't file a motion for directed verdict after one witness has testified. That's not how this works. If, for example, Dr. Fallis was the only general surgery expert put forth by Plaintiff, maybe the circumstances would be different, but that's not what happened in this case. The trial court did not consider the standard of care opinions of Dr. Rossi or Dr. Para, and not even those that we just discussed. And Dr. Para testified. He was using his own clinical judgment as to how to advance the surgery. This is important because the defense, and this is on Report Proceedings 502, this is important because the defense contends that Dr. Para was merely conducting the surgery under the supervision of Dr. Rossi, the attending, but he's using his own clinical judgment. He said that is evidence to be considered by a jury. He also says the standard of care requires protecting the external iliac from injury when operating with retroperitoneum. I already discussed it. He says the standard of care requires identifying major vascular structures, the external iliac, before clipping, cutting, or dividing. That's on the record 508, 509. The standard of care requires knowing where you are in the anatomy and being confident that you can perform it laparoscopically. Those two alone would still preclude a directed verdict. And then what's more is Dr. Rossi contributes. He says standard of care requires protecting the iliac artery from injury. That's on the record 560. Requires that the external iliac be preserved. Requires knowing where you are anatomically and being confident you can perform it laparoscopically. That's approximately, just going off of my head, 9 to 12 opinions, somewhere in there. On the standard of care, in plaintiff's case in chief, it can simply not be said that all the evidence so overwhelmingly favored the defense, meaning plaintiff didn't set forth any standard of care opinions as to what was required of Dr. Parra or against what his conduct should be judged. That's not the case, just on those citations alone. And, you know, it's for the jury to decide what the exact standard of care is in the matter. That's in the Hardy case and that's even in IPI 105.01. That's on the common law record 5665. That's literally in the jury instruction given to the jury in this trial. Although they were not allowed to do that because Dr. Parra had already been given a directed verdict before that instruction was given to the jury. Counsel, can you explain to us what weight the court gave or what weight we should give to this statement of Dr. Fala that there was no standard of care requiring the conversion of laparoscopic surgery procedure into an open incision? That there was no standard of care, Your Honor? As to that particular act. Well, the breaches in particular are these. Continue dissecting when unable to identify the anatomy being transected. So, respectfully, sorry, to answer your question, I don't believe that that particular testimony relates to these breaches that they are moving on. And, in fact, I would point to the breaches that they testify to. Dr. Fala testified it was a breach to continue operating when unable to visualize the anatomy. He said, if we're honestly set to convert to open, and Dr. Parra continued, that would be a breach. Now, we're not talking about a breach, but just for purposes of addressing your question. And Dr. Parra breached the standard of care by injuring the external iliac. This is already addressed much beyond just setting forth the standard of care. I'm following your argument with regard to the evidence put forth, but I suppose I'm trying to understand why it is the court found for directive verdict. There seems to be this language that there was no standard of care with regard to this conversion from the laparoscopic to the open procedure. And so I suppose I'm asking you what relevance, if you know from the record, the court gave that. My recollection was I don't think it applied to this argument. The argument was set forth on 717 and 719. I don't think that that particular allegation applied to this argument as a whole. All the court did, in my own words, was listen to the arguments of the defense counsel and say, you know, Dr. Foust didn't satisfy the standard of care as to those particular allegations that I had mentioned. I don't think conversion to open played a role, but I do know he did say standard of care requires to convert to open if unable to delineate anatomy. So he already said that. So to the extent that there was conflicting testimony, that was for a jury to say, I don't believe Dr. Foust because he contradicted himself. But that doesn't mean that that testimony gets completely excluded from the record. That's not how it works. So I hope that further answers that question. Now, all this is important because Dr. Rossi, in plaintiff's case in chief, testified that injury to the external iliac artery was a cause of the death of Mrs. Ely. Now, that's important because all of these led up to what happened next. Dr. Rossi and OSF, they filed simultaneous motions for a verdict. Dr. Perez was heard first, and then Dr. Rossi was heard second. After getting that on a directed verdict, the defense argued that injury to the external iliac artery should be excluded as to Dr. Rossi because he wasn't the one actually manipulating the insurance. Now, there are many reasons why that was inappropriate. The first being the defense never brought a directed verdict as to that particular allegation. In their actual directed verdict, they highlighted numerous breaches, but of the three, there was three that they didn't highlight, meaning they didn't take issue with three of them, one of them being injury to the external iliac artery. It's not in their motion for a directed verdict. Then, after the close of their evidence at the jury instruction conference, they backdoored a motion for a directed verdict by way of argument, still having never filed a motion for a directed verdict. That's a waive. Illinois law says that's a waive. In any event, it was still inappropriate because external iliac artery was talked about 91 times, approximately, throughout the course of the trial. This was the heart and soul of plaintiff's case. Plaintiff even proffered a reasonable alternative, such as allowed the resident to injure the external iliac artery, and this was because of the conflicting nature of Dr. Perez and Dr. Rossi's testimony. Dr. Perez saying, we were doing the surgery together, I was using my own clinical judgment to advance the surgery, and Dr. Rossi saying, well, I was standing behind him, I was telling him where to go, we knew where we were at because I was telling him where we were at. Those are conflicting testimony, and plaintiff is allowed to incorporate all of those when crafting instructions, specifically the issues instruction. There was no dispute, as I mentioned a moment ago. There was an injury to the external iliac artery. It caused a death and mishearing. Now, what happened was, at the hearing, the counsel for PSG and Dr. Rossi suggested that that be excluded because Dr. Rossi wasn't holding the instruments. Plaintiff offered a reasonable alternative. The court, even initially, on an initial glance, said, what if we used a loud resonant, something like that, because that was a mirror of allegation A, which is one that was actually in the instruction already. The defense objected vehemently, and the court excluded injuries to the external iliac artery in its entirety from the jury instruction. So as it stood, 91 times this is mentioned throughout the trial, it's been talked about how this is a breach of the standard of care by Dr. Fallis. It's been talked about that this was a cause of Ms. Geely's death by Dr. Rossi, one of the defendants himself. And yet, the jury was not permitted to consider that. We know this because the defense, to be more particular, PSG and Dr. Rossi, after having this excluded, gets up in closing argument and says, let's look at the way plaintiff's counsel is alleging that Dr. Rossi was negligent. And they threw up the list of remaining allegations on the burden of proof instruction. And they say, I'm going off a memory, it's like allegations A through F, if it's not on this list, it's not for your consideration. That is absolute prejudice. If it's not on the list, if it's not on the instruction, you can't consider it. And that is the law. The jury couldn't consider injury to the external iliac artery. And if they had been allowed to, it would have changed the course of the trial. Specifically, they would have already been armed with Dr. Rossi's concession as to causation. All they would have had to determine is whether it was a breach of the standard of care. And that's up to them. But they didn't even get to that point. Numerous law, specifically the Sherman case in the 4th District, says that the trial court is bound as a matter of law to instruct the jury on all issues reasonably presented by the evidence. This was presented every single which way. It cannot be said that this was not. And a trial court is supposed to give a reasonable alternative. Plaintiffs suggested a reasonable alternative if the trial court originally entertained one, but then refused after pressure from the defense. It was already not subject to a motion for rectify. So to take it a step further was seriously prejudicial to the plaintiff. I want to turn very briefly to the disparate application of the expert testimony in this case. I'd like to start with Dr. Chan, who is a PSG, I'll refer to them as PSG, and Dr. Rossi's general surgery expert. He came up as the defendant's case in chief. Now, Dr. Chan testified that Dr. Rossi acted appropriately and within the standard of care for a general surgeon by suture ligating the external iliac artery. And that's on the record 793 and 800 report proceedings. Now, this was also a breach that was actually contained in the instruction submitted to the jury. That's on 5669. But the trial court crippled plaintiff's ability to cross-examine Dr. Chan because what happened was plaintiff's counsel attempted to impeach Dr. Chan with a learned treatise. And defense objection was relevance. That was it, relevance. Now, it cannot be said that, let me get to the substance of the actual treatise. The treatise says the iliac artery should never, never be ligated, meaning it should never be tied off because what that does is it closes off the blood supply and the blood flow. And Dr. Chan had just testified it was actually appropriate for Dr. Rossi to suture ligate it, to tie it off. It's directly conflicting, directly conflicts with Dr. Chan's standard of care opinion. Plaintiff was allowed to impeach him with that. And in terms of relevance, it would make it less likely, Dr. Chan's opinion less likely true given that it directly conflicts with authoritative treatise. Now, at some point in the offer of proof, it was mentioned that this wasn't, this is a chapter on vascular surgery and, you know, for various reasons the defense raises the arguments. And here's the thing, Dr. Chan, as to foundation, Dr. Chan says it was a good book. It's still authoritative language within the state of Illinois. It's recognized by case law. But also Dr. Chan admitted, Dr. Rossi also said it was authoritative. So two witnesses are saying authoritative, although Dr. Chan did say, he was asked specifically, do you consider it authoritative? He says no, but he also admits it was a good book. So that doesn't take it out of laying the foundation. Then the court precluded this testimony from, precluded plaintiff's counsel from using this testimony to impeach Dr. Chan. This is important because counsel is permitted to test the bias and credibility of the witnesses. Now this will apply numerous times through the remainder of this section, but right now we have a learned treatise that directly conflicts with the testimony of Dr. Chan and that was not allowed to be submitted to a jury or for the jury to hear it in consideration of the breach that was actually contained in the instruction. It would have changed, in my opinion, the consideration of that breach, whether Dr. Rossi breached the standard of care by suture ligating the external iliac artery. But at the very least the jury was allowed to consider it during their deliberations, but in this case they were not. Now as to defendant's claim that it was vascular surgery, well the book itself, he was asking Dr. Chan about what is the standard of care or opinions about a general surgeon when dealing with vascular trauma. This wasn't about a vascular surgery. This was a license of adhesions procedure conducted by a general surgeon. No one's talking about the treatise being utilized to establish a standard of care. It's used to contradict the opinions, to explain, repel, and contradict the opinions of Dr. Chan. Now fast forward to Dr. Roback. This is before trial. Dr. Roback is OSF's blood bank expert and Dr. Roback testified in his own words. Question, now would you characterize yourself as an expert on massive transfusion protocols at level one trauma centers, which OSF is? A, answer, at level one trauma centers, no, simply because I don't have hands-on experience there, but in terms of reviewing literature I understand it pretty well. He admits he has no hands-on experience with level one trauma centers. Now Bartonis literally rejected expert testimony and said that was error to allow in. And the Bartonis case said that where the physician failed to prove that he had experience within the community or at the hospital at issue, it was error to allow that testimony. That's exactly what happened in this case. He had no hands-on experience at level one trauma centers. He wasn't an expert in massive transfusion protocols, which was the protocol at issue in this case in terms of delivering the blood in time. It took 19 minutes. That was the big conflicting issue. Okay, so we have Dr. Chan not being able to impeach him. We have Dr. Romek still being allowed to testify despite his own concessions. And I bring you to Dr. Fowles. I'm sorry, I want to fast forward. I bring you to Dr. Triozzi, plaintiff's blood banking expert. Plaintiff's idly disclosed rebuttal opinions contradicting Dr. Romek's opinions. So notwithstanding the trial court's actual admissibility of Dr. Romek, plaintiff was ready with timely disclosed rebuttal opinions to contradict those. Prior to trial, before putting on any witness, the trial court struck those rebuttal opinions and precluded the plaintiff from talking about them whatsoever. That was error because they were timely disclosed by agreement and in agreed order by everybody, signed by all parties. But two, the need to, I believe my time has expired. You can finish that thought. Thank you, Your Honor. The need to disclose wouldn't have arose until the defendant actually put on their case sheet. It was premature, prejudicial, and the plaintiff was not allowed to rebut, dispel, or contradict those opinions. Thank you. You'll have time when we vote. Thank you, sir. Good morning, Your Honors. Joseph Quill on behalf of the OSF defendants. I want to start by addressing the plaintiff's argument about the directed verdict. As an initial matter, the plaintiff contends that the OSF defendants conceded in their post-trial motions or I'm sorry, their directed verdict motion, that they had actually presented evidence of a standard of care and breach. And I believe what they're pointing to is a statement at Common Law Record 3429 where we state, in support of allegations A through D, the plaintiff presented evidence through expert testimony of Dr. Moses Phallus to opine that the surgical care provided by Dr. Parra and Dr. Rossi deviated from the standard of care. Now, in isolation, that could be seen as saying that he has presented it. But when you read this sentence in the context of the rest of the motion, and at the end of the paragraph we say, plaintiff has failed to meet his burden with respect to allegations A through D of counts 9 through 10 of the Second Amendment complaint. And then on C3431, we state, it is plaintiff's burden to establish the standard of care and breach thereof in the face of Dr. Phallus' testimony that he was not critical of Dr. Parra and ultimately conceded that there's no standard of care, then it is clear that his burden has not been met with respect to Dr. Parra. So my only point there is that the OSF defendants did not concede that there was sufficient evidence of the standard of care and breach. Now, I want to start off by addressing Justice Kavanaugh's comment about Dr. Phallus' testimony. And in this testimony, this is testimony that supports the directed verdict on all of the allegations, all the three allegations at issue. Dr. Phallus testified that, quote, there is no standard of care for all the things that we're talking about, unquote. And that's at the record 499. So although the Plaintiff's Counsel was trying to limit it to certain allegations that he said weren't at issue with his directed verdict, it's clear that Dr. Phallus said there's no standard of care as to all the things we're talking about. If there's no standard of care, there can be no negligence. Second, Dr. Phallus made clear throughout his testimony that his criticism was primarily directed at Dr. Rossi, who was supervising Dr. Parra. And here's an exchange question. If Dr. Parra was operating in a manner that he was instructed to do, then you wouldn't be critical of him, would you? Answer, the criticism is of Dr. Rossi. Question, so I'll ask my question again. If Dr. Parra were operating in a manner that he was instructed to do, then you would not be critical of him. Answer, for the most part, that is true. The evidence overwhelmingly showed that Dr. Parra operated as he was instructed to do by Dr. Rossi. And Plaintiff doesn't explain how in the view of this testimony from his own expert, and whether his own expert questions Dr. Parra's performance only to a certain point or degree, how any other testimony can be relied upon to support or to defeat a directed verdict. Now, with respect to allegation D, that's the allegation that alleged that Dr. Parra negligently injured the external iliac artery. Now, there was testimony in the record that surgeons were not supposed, were supposed to protect or avoid injuring the iliac injury. But a standard of care cannot be defined simply by saying, don't injure an artery or don't injure a portion of a patient. If that's the case, then any bad outcome would be a breach. And that's simply not the law. And in fact, Dr. Fallis conceded that the occurrence of a bad outcome in and of itself is not evidence of a breach of standard of care, as of Record 494. To show a proper standard of care with respect to the injuring of the iliac artery, the evidence had to show what the standard of care required a surgeon and Dr. Parra's circumstances to do. And to show a breach, it had to show how Dr. Parra deviated from that standard of care by injuring the artery. And the testimony that the plaintiff has cited just doesn't do that. So that's allegation D. Allegation A was... So you're saying this can happen without the breach? That's correct. Simply injuring an artery or injuring somebody, that's not evidence of the standard of care or a breach. You have to show that there was a standard of care that was deviated from that resulted in that injury. And simply trying to define negligence by injuring an artery doesn't give you evidence of either the standard of care or the breach. Yeah, here it's not simply the injury of an artery. This is the injury of an artery that couldn't be seen at that time. Well, I think that goes to the different allegations. I think to the extent that they're trying to say that there was a standard of care that was deviated from, that goes to allegations A and B. So just simply saying he was negligent by injuring the artery, that doesn't show a standard of care and that doesn't show a breach. So allegation A, that is that Dr. Parra negligently continued to dissect when unable to identify anatomy being transected. And I think that relates to your comment, Justice Kavanaugh. And so in defining the standard of care, you must account for the same circumstances faced by the defendant physician. And here the physician is Dr. Parra. He's a surgical resident. He's doing the operation under the guidance and the direct supervision of Dr. Rossi, the attending physician, and it's Dr. Rossi who decides what to delegate to the resident. As Dr. Fowles testified, the role and responsibility of the resident performing the surgery is determined by the attending physician. He was asked, question, you agree, don't you, that the amount of responsibility delegated to a resident physician in a surgical procedure is a matter of clinical judgment on the part of the attending, right? Answer, of course. And plaintiff, in their closing argument, on appeal in both their opening and their reply brief, has emphasized Dr. Rossi's testimony that he was the captain of the ship and primarily responsible for the operation. So for the plaintiff to properly establish Dr. Parra's standard of care in relation to this allegation, they have to show, through expert evidence or other sufficient testimony, that the standard of care required Dr. Parra to make the decision to stop dissecting on his own without instruction from Dr. Rossi. And none of the testimony in the record in the plaintiff's case in chief provides that evidence. So that is allegation A. The last allegation, allegation B, is that Dr. Parra was negligent by continuing to dissect after being told by Dr. Rossi to stop. Now, independent of Dr. Fowles' testimony that there is no standard of care for any of these things we've been talking about, the evidence overwhelmingly showed that Dr. Parra did not continue to dissect after he was told to stop to convert. Dr. Parra testified that he stopped as soon as the injury occurred and that he was not told to stop or convert to open before the injury. Dr. Fowles, the plaintiff's own expert, similarly testified that Dr. Rossi did not issue an order to convert to open before the injury, and he couldn't recall any evidence showing that Dr. Rossi told Dr. Parra to stop operating. The only purported evidence the plaintiff points to is deposition testimony that was read by the plaintiff's attorney when trying to impeach Dr. Rossi. And our position is that an attorney reading deposition testimony for purposes of impeachment is not substantive evidence that the jury can rely on. And even if it was, the testimony at issue was so equivocal and ambiguous that when weighed against the unequivocal testimony of Dr. Parra and Dr. Fowles, any significance that it has fades away in light of that unequivocal evidence. And that's Pedrick, the Supreme Court case, and also the private bank case that we cite in our brief. What was uncertain about the deposition testimony of Dr. Rossi with relation to when the cut occurred? He didn't give a consistent time as to when the injury occurred. This is the wrong wording, but just after giving the statement and 30 seconds were the two time periods that I recall reading about. There was also instantaneously. Instantaneously, yes. He said, I believe the 30 seconds testimony was, well, it could have been, I think the question was, well, it could have been 30 seconds, and it could be, and the questions were, it could be this, and it was sort of like, it could be that. But consistent with the idea that after saying this needs to be open and thus you should stop, it happened afterwards in terms of Dr. Parra making the cut. I would say the testimony from Dr. Rossi that they were reading in from the deposition was not clear that that is in fact what happened. He wasn't clear as to whether it was before or after. At most it's speculation. What can you cite to in the record that would indicate that it happened before that comment? So Dr. Parra testified at record 507-08 that he stopped as soon as the injury occurred and that he was not told to stop or convert to open before the injury. That's at record 508. Dr. Fallas, plaintiff's expert, testified that Dr. Rossi did not issue an order to convert to open before the injury. That's at record 483. And that he couldn't recall any evidence showing that Dr. Rossi told Dr. Parra to stop operating. That's at record 499. With regard to Dr. Rossi's deposition testimony, you don't have any instance where there's testimony that the cut occurred before he stated it would be an open procedure at that point on? I don't have any specific testimony in front of me, Your Honor. Thank you. I see my time is up. Thank you, counsel. See the bill, counsel. Good afternoon, Your Honors. Again, I'm Scott Howey. I represent the defendants at Belize, Dr. Thomas Rossi and the Peoria Surgical Group. May it please the Court. The trial court was well within its discretion to refuse an issues instruction that the jury could find Dr. Rossi injured the external iliac artery, an instruction that not only would have been at odds with the evidence but wouldn't even have reflected what the plaintiff's theory was. It's never been the plaintiff's theory that Dr. Rossi himself injured the external iliac artery. The plaintiff has a valid theory and had ways of trying to prove that Dr. Rossi might have been held responsible for that injury caused by Dr. Parra, that he might have been to blame for it and could be held liable for it. But it was never the plaintiff's theory and never even an issue in the case that Dr. Rossi himself might have injured that artery. And yet that is the instruction that the plaintiff urged the trial court to give among the issues that were contained in IPI 20.01 that was tendered by the plaintiff's counsel. The theory, of course, as I've said, is that Dr. Rossi was liable because of the undisputed fact that someone else injured the artery. So the plaintiff had ample opportunity to argue that theory, the theory that Dr. Rossi could be held liable for an injury that someone else caused. And it was even reflected in the instructions that the jury was given. The jury was told that it could find that Dr. Rossi was negligent for allowing a resident to proceed, allowing a resident to continue to proceed with a lysis of adhesions when they were unable to identify anatomy. And that is the appropriate instruction given by the trial court, reflecting the plaintiff's theory regarding the injury to the artery caused by someone else, not by Dr. Rossi who at that point in the trial was the only remaining individual defendant. There was also a separate allegation given to the jury as part of the issues instruction that Dr. Rossi was negligent in failing to timely scrub in, which also goes to that same question of how he could be held responsible even though he wasn't the one holding the instrument and he was never alleged to be the one who committed the injury. The plaintiff suggests that his alternative derivatives were reasonable to give to the jury if the judge wasn't going to give the instruction that Dr. Rossi himself caused the injury himself. But neither of those instructions or those derivatives was an appropriate or necessary way of instructing the jury either. One of them proposed by the plaintiff's counsel was to say that as attending supervising the resident, he injured the external iliac artery and that's no better than the original. The other potential alternative was that Dr. Rossi could have been negligent because he allowed, as the plaintiff's counsel put it, allowed the resident to injure, I'm sorry, allowed the resident, and that would be Dr. Parra, to injure the external iliac artery. And that would have been inappropriate because there was no evidence that Dr. Rossi could have done or should have done anything to prevent Dr. Parra from injuring the artery except by not allowing him to proceed with the procedure given that he couldn't visualize the anatomy. And that's what the instruction said. The instruction given to the jury was that Dr. Rossi could be held liable because he allowed a resident to continue to proceed with a license of adhesions when they were unable to identify anatomy. That accurately reflected what the plaintiff's theory was. It accurately reflected evidence that the plaintiff presented. It didn't emphasize any portion of the case or the theory unduly or unnecessarily. And importantly, it didn't contradict both the evidence and the plaintiff's theory with regard to the person who committed the injury. The undisputed fact that it was Dr. Parra who held the instrument and injured the artery himself. So it was well within the trial court's discretion to reject not only the original tendered instruction, but the alternatives and the derivatives that the plaintiff's counsel suggested at the instruction conference in favor of an instruction that better reflected what the evidence and the theories were. And tell us again what that better instruction was. The better instruction was the one the court gave. And that's the instruction that the plaintiff's theory was that Dr. Thomas Rossi and Peoria Surgical Group were negligent in the following respects. And A was allow a resident to continue to proceed with the license of adhesion, that's the procedure, when they were unable to identify anatomy. So the jury determined, apparently, that proceeding, even though you couldn't quite see what you're doing, which is the way a layman would talk about it, that that's okay. Well, we don't know what the jury found, but we do know that the jury was told that it could consider that. Right. And evidently, it could have found that that was something that didn't happen, or that it was consistent with the standard of care, or that it didn't cause the ultimate injury. And there's a number of different ways. We have a general verdict, so we don't know specifically. Well, but there's no dispute, or is there, that there reached a point in the surgery where the ability to visualize the rest of the anatomy, where that iliac artery was, was obscured, or not available to the person that is wielding the instruments? There was evidence to that effect, yes. So the jury could have concluded that. And the instruction allowed them to conclude that. What it did with that information, we don't know, given the general verdict. But it was properly allowed to consider this as the, there are a number of allegations of negligence. This is the one that is at issue, because it was properly allowed to consider that in connection with the actual performance of the injury. Because Dr. Rossi didn't cause it. We know that. That's never been alleged, or approved, or put into evidence. It's not even the plaintiff's theory. With respect to the question, the other trial error issues, and the ones that have been raised today, I would focus specifically on the question of the learning treatise, the Savastan text, an issue that the plaintiff wanted to use to impeach our expert. I can't speak to the general notion that the plaintiff has given you, that there was some sort of disparate treatment by the trial judge, and that this was somehow unfair, because many other rulings were also given adverse to the plaintiff. I can tell you that the judge gave due consideration to every individual ruling that he was asked to make. There is no rule of trial procedure here, that there is a need to have a balanced number of rulings over the course of a trial. Any trial judge during the course of trial rules on numerous motions in limine, motions, objections, and such, and does so on an individual basis. If there are more in favor of one party, and less in favor of the other, that's not a basis for reversal, and the plaintiff hasn't cited any rule of law that suggests that that's the case. With respect to the one that he's focused on this afternoon, however, the trial court was well within its discretion to prevent the plaintiff from using the Savastan text to impeach Dr. Chand. At most, what the plaintiff suggests is that it might have been within the judge's discretion to allow the text to be used. That's a very different thing from arguing that it was an abuse of discretion to do what he did, which was to buy that text. The plaintiff doesn't even argue, let alone prove, that it was an abuse of discretion. Consider the reasons that the trial judge had for not letting him use his impeachment. The text concerned vascular surgery, while Dr. Chand is a general surgeon. So is Dr. Rossi. So is this procedure. In fact, the plaintiff acknowledged this afternoon that this was not a vascular surgery case. And the text concerned vascular surgery, and that's an important distinction that is recognized, I believe it's in the Bowen decision from the First District, where the fact that a text referred to a different subject was relevant. I see that my time has expired. I don't want to take any more of the court's time unless necessary. I'm happy to address any questions that the court might have. But otherwise, I would simply ask the court to affirm the judgment in all respects. Were there, if I could? Yes. You were going through some reasons that the court had for denying impeachment with this treatise. You've mentioned one. Are there others? There is. The other major reason, and the plaintiff's counsel acknowledged it also this afternoon, that Dr. Chand expressly denied that the text was authoritative. The other cases that have been raised, there are three cases the plaintiff has cited in which other, all the First District, I believe, have affirmed allowing the use of a text to impeach. But those are all cases in which the text had not been affirmatively denied as being authoritative. It isn't necessary to call it authoritative, certainly, but the praise for this text, if you can call it that, was fairly tepid and has to be considered in conjunction with the fact that the witness it was going to be used with had expressly denied and disagreed that it could be considered an authoritative text. The plaintiff has also suggested that- What's the difference between an authoritative text and a good text? Didn't somebody, this was referenced as you said tepid, but is it good? Good. Responding to a question, I believe, he was asked if it's a good text that you use sometimes, isn't it? And he said yes. So it's, you know, it's a question for, I mean, this goes to the discretion of the trial judge. Understood. Who did not regard that as sufficient in this case to allow its use. Not only did Dr. Chand not call it authoritative, in fact he called it the opposite, but the plaintiff has suggested that Dr. Rossi acknowledged it to be authoritative and there is no testimony to that effect at trial. There is something ambiguously in the neighborhood in Dr. Rossi's deposition and the plaintiff did manage to get Dr. Chand to say that Dr. Rossi had called it authoritative but there is no backing for that and that in fact is not the case and it does contradict what Dr. Chand himself thought about the text, which as we've noted is on a different subject. Thank you. Rebuttal. I'll attempt to be brief. I'd like to work backwards just to address OSF first just so I don't forget about it. So counsel for OSF and Dr. Parra came up here and argued that, you know, the standard of care is proffered by Dr. Fallis. We're not genuine standard of care. First of all, standard of care is not something that's regulated by legislature. It's not regulated by case law. It's what a doctor's opinion is on the standard of care. There's no such thing as a genuine or not genuine standard of care. The Steele case, which is the case that the defendants love to cite in this agency argument, literally says that it is the duty of the jury to consider all of the opinions and make the final determination as to what the standard of care is. Counsel got up here and argued much beyond whether the plaintiff had set forth what the standard of care was for Dr. Parra, far beyond that. The sole issue, the sole issue for this court to decide is whether plaintiff's evidence in this case in chief set forth the standard of care for which Dr. Parra was to be judged by, and if it did, this court must overturn that directive verdict. I'd like to fast forward to Dr. Rossi and PSG's arguments a moment ago just because they're more fresh. One of the things asked about was whether the instruction was appropriate regarding this injury to the external iliac artery. Now, Dr. Rossi testified in no uncertain terms that he was the captain of the ship. That's on Report of Proceedings 562. He knew they were in the vicinity of the external iliac artery, that's on 568, and he let Dr. Parra continue anyways. He was the mastermind of this procedure, although Dr. Parra, as a resident, was also using his clinical judgment. The jury's allowed to consider both of those sets of evidence when making its determination in this case, but they were precluded from doing that. That doesn't discount what Dr. Parra said. That doesn't discount what Dr. Rossi said. But collectively, it goes to the jury. And that is the problem and the issue here, because that didn't occur. Counsel, OSF argued that the instruction that was given was sufficient to cover the circumstances you're talking about. Why is that not the case? Well, what I looked at was allowing a resident to proceed. Now, the timing of it, that's the actual issue. The timing of it, there was numerous testimony about how long it took, how long they were in tiger country, how long they were unable to delineate anatomy. Perhaps the jury thought, okay, maybe it's not a breach of the standard of care to allow them to proceed when they are unable to delineate anatomy. Perhaps, speculating. But that's not the same thing as, is it a breach of the standard of care to injure the external iliac artery? Because one occurs minutes before you actually injure the artery. They're not one and the same. It's not implicit. Despite the best argument that it's inherent, the courts have always cautioned that you can't separate out injured cases like that, because jurors are lay people. They need the instruction in a particular manner, and they should be listed, all reasonable presented issues should be listed in the instruction. Here, to address your point further, sir, is allowing the resident to proceed happens, I think, three to four minutes or six to seven, based upon how the testimony came out in trial, before the injury actually occurs. Some said it was 30 seconds, and then the injury occurs. Some said it's one to two minutes, where we couldn't identify anatomy. One to two minutes of allowing him to proceed, but they still hadn't cut the external iliac artery. That's why they're different, because one is not in the same scope of time as the other, and that is why it was improper. Impeachment evidence. Very briefly, we talked about this treatise and whether it was proper for the court to allow it. Plaintiff satisfied the foundational requirement to allow the use of this treatise to impeach Dr. Chan. It is that simple. And then also, the actual objection that was sustained was relevance. It wasn't foundation, it was relevance. That is the actual focus of why it was improper. Plaintiff may have offered proof and delineated further additional reasons, but the actual objection itself is relevance, and that's what this court must decide on. Was it relevant? Was it more likely than not that Dr. Chan's opinion that suture ligating the external iliac was within the standard of care? And we posit that it would have shown the exact opposite. Courts have acknowledged that jurors are allowed to consider such testimonies. I see my time has expired. Thank you, Brother.